Filed 4/4/25  P. v. Garcia CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>ANGEL ANTHONY GARCIA,<br><br>Defendant and Appellant. | F086743<br><br>(Super. Ct. No. F23901041)<br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Fresno County.  Adolfo M. Corona, Judge.

Steven A. Torres, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Kimberley A. Donohue, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and Hannah Janigian Chavez, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

## INTRODUCTION

In June 2023, for crimes committed in January 2023 against the five-year-old daughter of his girlfriend, defendant Angel Anthony Garcia was convicted by jury of one count of oral copulation or sexual penetration of a child 10 years of age or younger and one count of lewd touching by force of a person under 14 years of age. (Pen. Code, §§ 288.7, subd. (b) [count 1], 288, subd. (b)(1) [count 2].)[1] In a bifurcated proceeding, the trial court found true the aggravating circumstances that defendant's prior convictions were numerous or increasing in seriousness (factor 1) and that the victim was particularly vulnerable (factor 2).[2] (Rules 4.421(a)(3), (b)(2).) In July 2023, the court imposed a mandatory term of 15 years to life on count 1 and, relying on the victim's vulnerability, the upper term of 10 years on count 2.[3]

Defendant timely appealed and challenges his conviction and sentence on two grounds. First, he claims the trial court erred by failing to instruct the jury with

---

[1] All further undesignated statutory references are to the Penal Code.

[2] The information also alleged, as factor 3, the aggravating circumstance that defendant served a prior prison term. (Cal. Rules of Court, rules 4.421(b)(3) [all further references to rules are to the California Rules of Court].) The prosecutor put on evidence of factor 3 and defense counsel did not contest it. However, through what appears to be mere oversight, the trial court neglected to make a finding that the factor was either not true or true beyond a reasonable doubt. "The trial court is generally required to include all aspects of a judgment in its oral pronouncement of judgment. [Citation.] Any discrepancy between the judgment as orally pronounced and as recorded in the clerk's minutes or abstract of judgment is presumed to be the result of clerical error." (*People v. Leon* (2020) 8 Cal.5th 831, 855.) We may modify a judgment on our own motion to correct clerical error. (§ 1260; *People v. Baker* (2021) 10 Cal.5th 1044, 1109.) Therefore, we shall direct the trial court to correct its minute order so that it reflects true findings only on factor 1 (prior convictions numerous or increasing in seriousness) and factor 2 (victim particularly vulnerable). As addressed in part II. of the Discussion, the record is clear that the court relied solely on the victim's particular vulnerability to aggravate defendant's sentence on count 2.

[3] In a separate case resolved by plea, the trial court imposed the upper term of four years for battery with infliction of serious bodily injury, to run concurrently with the sentence imposed in this case. (§ 243, subd. (d).)

CALCRIM No. 1193, Testimony on Child Sexual Abuse Accommodation Syndrome (CSAAS), and if we conclude there was no sua sponte duty to give the instruction, defense counsel's failure to request the instruction constituted ineffective assistance of counsel (IAC). Second, defendant claims the court's finding that the victim was particularly vulnerable was based on her age and is not supported by substantial evidence, and the court made a prejudicial factual error when it compared the victim's age of five years to other victims who could be up to the age of 18 years, rather than up to 14 years as the statute provides.

With respect to the instructional error, the People argue there is no sua sponte duty to instruct with CALCRIM No. 1193, this case did not include CSAAS testimony, defense counsel was not ineffective in not requesting the instruction, and defendant was not prejudiced by the absence of the instruction. With respect to the sentencing error, the People argue the trial court did not rely solely on the victim's age to find her particularly vulnerable, its finding is supported by substantial evidence, and its misstatement concerning age range was not prejudicial.

For the reasons set forth below, we conclude the trial court did not have a sua sponte duty to instruct with CALCRIM No. 1193, defendant did not receive IAC given the absence of CSAAS evidence, the trial court's finding that the victim was particularly vulnerable was based on more than the victim's age and is supported by substantial evidence, and to the extent the court erred in referring to victims up to the age of 18 years old, the error was harmless. Accordingly, we affirm the judgment, but instruct the trial court to correct its minute order from July 5, 2023, to reflect that only the aggravating circumstances alleged as factor 1 (prior convictions numerous or increasing in seriousness) and factor 2 (victim particularly vulnerable) were found true beyond a reasonable doubt.

# FACTUAL SUMMARY

## I.      Initial Disclosure

In January 2023, defendant was living with his girlfriend, L., and her children, including five-year-old daughter B.  L. testified she was a victim of sexual abuse and was "very overprotective."  She noticed a change in B.'s behavior and felt "something was just off."  B. was usually loving and happy, but had become down and upset, and started talking back.  L. asked B. if defendant had ever hurt her.  B. became scared and nervous, and she jumped in L.'s lap.  After L. reassured her, B. whispered in L.'s ear that defendant hurt her and touched her where she should not be touched.  B. also told L. it was a secret and defendant said "'[you] better not tell [your] mom or else you're gonna be'" (at that point L. used her hand across her throat).

B. told L. that defendant touched her the day he watched the children while L. went with her sister to a bakery.  L. testified she always kept her girls with her and she was reluctant to leave them that day.  However, her nephew had a rash, and her sister did not want the children interacting because it was contagious.  Defendant reassured L. that he "'would never do that'" and reminded her he had a daughter, too.  B. disclosed that after L. left for the bakery, defendant went into the bathroom where B. and her younger brother were, and he told her brother to leave.  B. then said defendant "'put his in,'" first pointing to her vaginal area and then to her mouth.

At trial, L. testified that she had not seen anything concerning between defendant and B., but she described several incidents that stood out.  One occurred when she took a shower after B. had gone to bed.  She and defendant were not getting along so he was sleeping in a different bedroom.  B.'s door was shut when L. went to shower.  While in the shower, she heard a scream and defendant came into the bathroom to say he heard someone scream.  When L. got out of the shower, B.'s door was open slightly, but B. appeared to be sleeping.  The next morning, L. saw B. go to the laundry room and take

4.

off her pajamas.  B. said she had peed in her pajamas, but L. testified B. had been potty trained since the age of two years old.

The other incident occurred when B., who had nightmares, came into L.'s bedroom where she and defendant were sleeping.  L. placed B. on her side of the bed, but she woke up to find B. between her and defendant.  Defendant's hand appeared to move away fast and L. demonstrated by moving her arm from right to left across her chest and then moving her hand back, from the left side to the right side.  L. grabbed B. and took her back to her own room.  L. testified she did not trust people and was suspicious so she even smelled defendant's fingers, but did not detect anything.

Two days after B.'s disclosure to L., she took B. to the hospital.

## II.     Statement to Police

At the hospital, Officer Gomez spoke to B. over several hours.  B. told him that when her mother was in the shower, defendant came into her bedroom where she was in bed, "unclipped" her pants and put his finger in her butt.  She then clarified he put his finger where she peed from, and she said pee comes from the front and poop comes from the back.  She stated she did not like it when defendant put his finger inside her and she screamed.  Defendant then ran out of the room.  She also said she had not felt that before.

B. told Gomez that when her mother went with her aunt to get bread, defendant took her to the bathroom.  She said she saw his "pee-pee," he put it in her mouth, and he wiggled it around.  She then said he peed in her mouth, it tasted like blood and carrots, and the substance was soft and soggy.  She did not like how it tasted; said "eew"; and spit it in the sink.  She said defendant laughed and she told him, "'That's not funny.'"  She said the substance got on her face, on her clothes and in her eye.  Based on her description of the pink or purple pajamas she was wearing, police collected pajamas and her bedroom sheets for analysis.

5.

## III.    Forensic Interview

Approximately one week after L. took B. to the hospital, a forensic interview was conducted.  Detective Aranas observed the interview from a separate room.[4]

B. said that when they were in the bathroom, defendant, whom she described  as both her father and her stepdad, opened her mouth and put his private part in.  Then he peed in her mouth and she spit it in the sink, describing it as "green, yellow, and then purple, I think."  She described feeling her mouth wiggling and stretching; pee going up and down; and the substance tasting like red apples, peanuts, and a red potion with apples and poison inside.  She also said she felt like she was choking and defendant laughed at her.  Subsequently, she said she tried to keep her mouth closed, but defendant forced it open.

B. also said she screamed when she was in her bedroom and her mother was in the bathroom, and she stopped defendant from peeing.  She then said something happened in her room, nothing happened in her room, and she was in her bathroom when she screamed.

## IV.    B.'s Testimony

At the time of trial, which was approximately five months after her disclosure of abuse to her mother, B. was six years old.  She said she did not remember in response to many of the prosecutor's questions.  She remembered her mother crying because she had said defendant touched her, but she could not remember where he touched her.  She recalled going to the hospital, talking to the police, and talking to the forensic interviewer.

B. later testified that defendant touched her "private" in front where pee comes from and it happened in the bathroom.  She then said he touched her private part with his

---

[4]    Aranas's testimony about what he observed, which forms the basis of defendant's claim of instructional error, is summarized in part I.D.2. of the Discussion.

hand and she screamed because it hurt. When asked whether defendant used his whole hand or part of his hand, B. indicated he used one finger.

After saying nothing happened in the bathroom, with her mouth, or with defendant's private part, B. said she remembered telling police and the forensic interviewer that something happened with defendant's private part, and she was telling the truth. She said she saw defendant's private part in her mother's bathroom, and she was scared. She said she did not remember telling police and the forensic interviewer that defendant put his private part in her mouth, but when asked if it was the truth or a lie that he put his private part in her mouth and peed in her mouth, she said it was the truth. She also said she felt scared, it hurt, and it tasted and smelled disgusting.

On cross-examination, B. stated she remembered seeing defendant's private parts, and that something tasted and smelled like pee.

## V.    Other Evidence

The jury was read the following stipulation: "'It is stipulated that a pink, multi-colored onesie was given to the Department of Justice Bureau of Forensic Services for analysis. The onesie was examined visually with an alternate light source. Several areas of fluorescence were observed throughout the onesie and four stains were tested for the presence of acid phosphatase, a component of seminal fluid, with negative results. [¶] []Additional portions of two stains were extracted and tested for the presence of p30, a protein found in seminal fluid, with negative results. [¶] []Portions of the extracts were examined microscopically for the presence of spermatozoa, with negative results.'"

## DISCUSSION

## I.    Claim of Instructional Error:  Omission of CALCRIM No. 1193

### A.    Background

CALCRIM No. 1193, the pattern instruction for CSAAS testimony by an expert witness, provides:

7.



"You have heard testimony from _____ *<insert name of expert>* regarding [CSAAS].

"[CSAAS] relates to a pattern of behavior that may be present in child sexual abuse cases.  Testimony as to [CSAAS] is offered only to explain certain behavior of an alleged victim of child sexual abuse.

"_____'s *<insert name of expert>* testimony about [CSAAS] is not evidence that the defendant committed any of the crimes charged against (him/her) [or any conduct or crime[s] with which (he/she) was not charged].

"You may consider this evidence only in deciding whether or not _____'s *<insert name of alleged victim of abuse>* conduct was consistent with the conduct of someone who has been molested, and in evaluating the believability of the alleged victim."

In this case, the trial court instructed the jury on expert testimony more generally pursuant to CALCRIM No. 332,[5] but did not instruct the jury on the limited purpose of CSAAS evidence pursuant to CALCRIM No. 1193.  Nor did defendant request the instruction or object to its omission.[6]  He now claims the trial court had a sua sponte duty

---

**5**     CALCRIM No. 332 provides, "(A witness was/Witnesses were) allowed to testify as [an] expert[s] and to give [an] opinion[s].  You must consider the opinion[s], but you are not required to accept (it/them) as true or correct.  The meaning and importance of any opinion are for you to decide.  In evaluating the believability of an expert witness, follow the instructions about the believability of witnesses generally.  In addition, consider the expert's knowledge, skill, experience, training, and education, the reasons the expert gave for any opinion, and the facts or information on which the expert relied in reaching that opinion.  You must decide whether information on which the expert relied was true and accurate.  [¶]  You may disregard any opinion that you find unbelievable, unreasonable, or unsupported by the evidence.  [¶]  [An expert may be asked a hypothetical question.  A *hypothetical question* asks the witness to assume certain facts are true and to give an opinion based on the assumed facts.  It is up to you to decide whether an assumed fact has been proved.  If you conclude that an assumed fact is not true, consider the effect of the expert's reliance on that fact in evaluating the expert's opinion.]"

It appears from the record that defense counsel initially objected to CALCRIM No. 332, but after a discussion off the record, counsel agreed to the instruction.

**6**     Defendant notes he objected to the admission of CSAAS evidence, but it was overruled. The portion of the record defendant relies on reflects an objection to Aranas's testimony that B. talked about sexual anatomy in a way a child her age would not.  Defense counsel objected to the testimony as speculative, and the trial court overruled the objection based on Aranas's expertise

to give CALCRIM No. 1193 and the failure to do so violated his constitutional rights to due process and a fair trial. If we find no sua sponte instructional duty, he claims defense counsel rendered IAC by failing to request the instruction.

The People argue that Aranas's testimony did not rise to the level of CSAAS evidence, the trial court did not have a sua sponte duty to instruct with CALCRIM No. 1193, and defendant fails to cite to any authority supporting his position that the failure to give a limiting instruction violates his constitutional rights. They also argue that defense counsel's failure to request CALCRIM No. 1193 was neither deficient performance nor prejudicial.

Consistent with the People's position, CALCRIM No. 1193 is a limiting instruction and trial courts do not have a sua sponte duty to give such instruction. (E.g., *People v. Murtishaw* (2011) 51 Cal.4th 574, 590 (*Murtishaw*).) Therefore, the court did not err. Moreover, notwithstanding defendant's contrary claim, we do not agree this case involved the presentation of expert testimony on CSAAS, implicating the potential need for a limiting instruction on the evidence. (*People v. Bowker* (1988) 203 Cal.App.3d 385, 394 (*Bowker*).) As such, defense counsel's failure to request CALCRIM No. 1193 was neither deficient nor did it prejudice defendant.

## B. Standard of Review

We review a claim of instructional error de novo. (*People v. Waidla* (2000) 22 Cal.4th 690, 733; *People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "In criminal cases, even in the absence of a request, a trial court must instruct on general principles of law relevant to the issues raised by the evidence and necessary for the jury's understanding of the case." (*People v. Martinez* (2010) 47 Cal.4th 911, 953; accord, *People v. Thomas* (2023) 14 Cal.5th 327, 385.) "[I]nstructions are not considered in

---

and experience. As discussed, *post*, defendant fails to persuade us that Aranas's testimony constituted CSAAS evidence.

isolation.  Whether instructions are correct and adequate is determined by consideration of the entire charge to the jury." (*People v. Holt* (1997) 15 Cal.4th 619, 677; accord, *People v. Thomas* (2011) 52 Cal.4th 336, 356.)  Jurors are presumed to have understood and followed the trial court's jury instructions.  (*People v. Sandoval* (2015) 62 Cal.4th 394, 422.)

### C.      Limiting Instruction on CSAAS Evidence

#### 1.      CSAAS Evidence

"Expert testimony on CSAAS has long been held admissible in California for the limited purposes of dispelling commonly held myths or misconceptions about child sexual abuse and aiding the jury in 'evaluating the credibility of an alleged child victim of sexual abuse.'[7]  (*People v. Lapenias* (2021) 67 Cal.App.5th 162, 171 (*Lapenias*); see *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 (*McAlpin*); *People v. Bowker* (1988) 203 Cal.App.3d 385, 393–394 (*Bowker*).)  CSAAS testimony is permitted '"to explain the emotional antecedents of abused children's seemingly self-impeaching behavior,"' such as delayed disclosure of the abuse.  (*McAlpin*, at p. 1301; see *Lapenias*, at p. 172.)  An expert's explanation of CSAAS 'is admissible to rehabilitate [a complaining] witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation.' (*McAlpin*, at p. 1300.)" (*People v. Sedano* (2023) 88 Cal.App.5th 474, 479, fn. omitted (*Sedano*).)

"However, pursuit of that laudable rehabilitative purpose must not lead the expert to cross over into affirmatively vouching for the truthfulness of a complainant's

---

**7**      In *People v. Lapenias* (2021) 67 Cal.App.5th 162 (*Lapenias*), a child psychologist who testified explained, "CSAAS is a theory originally published in the early 1980's, which is designed to dispel common misconceptions about how kids experience and report sexual abuse" (*id.* at p. 169), and it involves five components:  "(1) secrecy; (2) helplessness; (3) entrapment or accommodation; (4) delayed and unconvincing disclosure; and (5) retraction" (*ibid.*).

allegations against the defendant. (See *Lapenias, supra*, 67 Cal.App.5th at p. 180 [identifying the problem of the expert "'vouching for the veracity'" of the alleged victims]; *People v. Munch* [(2020)] 52 Cal.App.5th [464,] 468 ["'The expert is not allowed to give an opinion on whether a witness is telling the truth .…'"].) CSAAS evidence 'is not admissible to prove that the complaining witness has in fact been sexually abused.' ([*People v.*] *McAlpin* [(1991)] 53 Cal.3d [1289,] 1300.) Accordingly, a CSAAS expert also 'may not give "'general' testimony describing the components of the syndrome in such a way as to allow the jury to apply the syndrome to the facts of the case and conclude the child was sexually abused."' (*People v. Julian* (2019) 34 Cal.App.5th 878, 885 (*Julian*).) Overall, the testimony must respect the ""'fine but essential'"" line between an ""'opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning [the] defendant's legal guilt.'"" (*Id.* at p. 887.)" (*Sedano, supra*, 88 Cal.App.5th at pp. 479–480.)

### 2. Split of Authority on Sua Sponte Instructional Duty

"When evidence is admissible as to one party or for one purpose and is inadmissible as to another party or for another purpose, the court *upon request* shall restrict the evidence to its proper scope and instruct the jury accordingly." (Evid. Code, § 355, italics added.) As the California Supreme Court has repeatedly stated, "'Absent a request, a trial court generally has no duty to instruct as to the limited purpose for which evidence has been admitted.' (*People v. Cowan* (2010) 50 Cal.4th 401, 479.) [However, t]here is a 'possible' narrow exception in the "'occasional extraordinary case'" in which the evidence "'is a dominant part of the evidence against the accused, and is both highly prejudicial and minimally relevant to any legitimate purpose.'"" (*Murtishaw, supra*, 51 Cal.4th at p. 590, quoting *People v. Hernandez* (2004) 33 Cal.4th 1040, 1051–1052; accord, *People v. Sanchez* (2016) 63 Cal.4th 411, 460; *People v. Rodriguez* (2014) 58 Cal.4th 587, 647–648.)

As the parties recognize, there is a split of authority over whether trial courts have a sua sponte duty to instruct the jury on CSAAS evidence, and defendant urges us to follow *Housley*, which found there is such a duty. (*People v. Housley* (1992) 6 Cal.App.4th 947, 958–959 (*Housley*).) In *Housley*, the Court of Appeal "conclude[d] that because of the potential for misuse of CSAAS evidence, and the potential for great prejudice to the defendant in the event such evidence is misused, it is appropriate to impose upon the courts a duty to render a sua sponte instruction limiting the use of such evidence. Accordingly, in all cases in which an expert is called to testify regarding CSAAS we hold the jury must sua sponte be instructed that (1) such evidence is admissible solely for the purpose of showing the victim's reactions as demonstrated by the evidence are not inconsistent with having been molested; and (2) the expert's testimony is not intended and should not be used to determine whether the victim's molestation claim is true." (*Id.* at pp. 958–959.)

Thereafter, in *Mateo*, the Court of Appeal disagreed with *Housley*, explaining, "[T]he holding in *Housley*, [is] at odds with our Supreme Court's decision in [*People v.*] *Humphrey* [(1996)] 13 Cal.4th 1073. Throughout its opinion in *Humphrey*, the court repeatedly referred to the trial court's duty to give a limiting instruction on the use of battered women's syndrome evidence on request. (*Id.* at pp. 1088, fn. 5, 1090–1091 (conc. opn. of Baxter, J.), and 1100 (conc. opn. of Brown, J.).) The majority opinion in *Humphrey* does not require a sua sponte limiting instruction on the use of evidence of battered women's syndrome, it suggests that an instruction would be discretionary on request: 'If the prosecution offers the battered women's syndrome evidence, an additional limiting instruction *might* also be appropriate on request, given the statutory prohibition against use of this evidence "to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge." (Evid. Code, § 1107, subd. (a); see CALJIC No. 9.35.01 (1996 new) (5th ed. Supp.).)' (*Id.* at p. 1088, fn. 5, italics added.) Battered women's syndrome is analogous to CSAAS. Both syndromes explain that

12.

victims' 'seemingly self-impeaching' behaviors—e.g., delayed disclosure, returning to the home—are consistent with their claims of having been beaten, raped, or sexually molested. (See *People v. Brown* (2004) 33 Cal.4th 892, 906; *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301.) We can think of no reason why a duty to instruct should be imposed in one situation and not the other." (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1073 (*Mateo*).)

*Mateo* also points out that *Housley* relied on *Bowker* in support of its holding, but "[w]hether the *Bowker* court intended to hold that the limiting instruction must be given sua sponte is unclear, as the opinion does not expressly discuss the point. Any doubt as to the intent of the *Bowker* court has been eliminated, because the same court that decided *Bowker* held in three subsequent cases that the limiting instruction must be given 'if requested.' ([*People v.*] *Stark* [(1989)] 213 Cal.App.3d [107,] 116; *People v. Sanchez* (1989) 208 Cal.App.3d 721, 735 (*Sanchez*), disapproved on other grounds in *People v. Jones* (1990) 51 Cal.3d 294, 307; *People v. Bothuel* (1988) 205 Cal.App.3d 581, 587 (*Bothuel*), disapproved on another point in *People v. Scott* (1994) 9 Cal.4th 331, 347– 348.) We are confident that *Stark*, *Sanchez*, and *Bothuel* accurately describe the intention of the decision in *Bowker*." (*Mateo, supra*, 243 Cal.App.4th at p. 1073.)

### 3. No Sua Sponte Instructional Duty

Defendant offers no persuasive argument for following *Housley*, particularly when the issue is viewed through the lens of the law on limiting instructions and the observations made in *Mateo*. CALCRIM No. 1193 is a limiting instruction and, consistent with controlling California Supreme Court authority, there is no sua sponte duty to give a limiting instruction. (E.g., *Murtishaw, supra*, 51 Cal.4th at p. 590; *People v. Hernandez, supra*, 33 Cal.4th at pp. 1051–1052.) To the extent there may be a narrow exception in an extraordinary case, this case does not present such an exception. Accordingly, we conclude the trial court did not err in failing to instruct the jury with CALCRIM No. 1193, sua sponte.

### D. IAC

#### 1. Standard of Review

Next, defendant argues that if we find no sua sponte duty to instruct, defense counsel was ineffective for failing to request CALCRIM No. 1193.

To prevail on a constitutional claim of IAC, a defendant "'must satisfy a two-pronged showing: that counsel's performance was deficient, and that [he] was prejudiced, that is, there is a reasonable probability the outcome would have been different were it not for the deficient performance.'" (*People v. Woodruff* (2018) 5 Cal.5th 697, 736 (*Woodruff*), quoting *People v. Alexander* (2010) 49 Cal.4th 846, 888; accord, *Strickland v. Washington* (1984) 466 U.S. 668, 687 (*Strickland*).) "'[T]he standard for judging counsel's representation is a most deferential one.' (*Harrington v. Richter* (2011) 562 U.S. 86, 105 (*Richter*).) We 'must indulge a "strong presumption" that counsel's conduct falls within the wide range of reasonable professional assistance because it is all too easy to conclude that a particular act or omission of counsel was unreasonable in the harsh light of hindsight.' (*Bell v. Cone* (2002) 535 U.S. 685, 702.) 'Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge.' (*Richter*, at p. 105.)" (*In re Long* (2020) 10 Cal.5th 764, 773.)

Therefore, a "defendant's burden [is] 'difficult to carry on direct appeal,' as a reviewing court will reverse a conviction based on [IAC] on direct appeal only if there is affirmative evidence that counsel had ""'no rational tactical purpose'"" for an action or omission." (*People v. Mickel* (2016) 2 Cal.5th 181, 198, quoting *People v. Lucas* (1995) 12 Cal.4th 415, 437.) "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." (*Strickland, supra*, 466 U.S. at p. 690; accord, *People v. Barrett* (2012) 54 Cal.4th 1081, 1105.)

14.

## 2. Aranas's Testimony

At the time of trial, Aranas had been a sworn officer for almost 30 years and assigned to sexual assaults for four and one-half years. He testified he had investigated approximately 350 sexual assault cases and had approximately 200 hours of sexual assault training. From an adjoining room, he observed B.'s forensic interview, which occurred approximately one week after L. took her to the hospital.

During direct examination, the prosecutor asked Aranas if he learned during training what to look for in trying to determinate the veracity of a child's disclosure. Aranas responded, "It kind of falls back to age-appropriate behavior. Again, [B.] described, you know, the word 'pee.' She even gave a description in the interview about what it tastes like to her. I try to fall back again on age-appropriate behavior. She was talking about a sexual anatomy which a child of her age would just not know."[8] After the trial court overruled defense counsel's objection on grounds of speculation, Aranas finished, "There are certain details you try to look out for, again, kind of what I've already described. There weren't words used in the interview that you saw, or heard— I'm sorry—about being molested or abused. There were the words she used to describe, and there was a lot of nonverbal cues."

Subsequently, after questioning Aranas about the anatomical drawings B. made, sexual assault examinations, and whether any items of clothing were collected, the prosecutor asked Aranas whether, through training, he learned anything about behavioral changes in children following sexual victimization. Aranas responded, "Yes, ma'am. Based on what I've seen, as well as my training, I've come to know victims who have acted out after being victimized from sexual assaults, become rebellious with teachers, students, parents, brothers and sisters; nightmares; urination in the bed; performing or

---

[8]  The forensic interviewer also testified yes when asked if B. described things a child her age would generally not know.

trying to act out sexual acts that were completed or, you know, on them. [¶] Again, age—nonage-specific sexual acts, stuff that, again, was conducted on them based on the actions or behaviors from the perpetrator. [¶] A lot of them continue to need therapy years and years down the road and some .…" The trial court sustained defense counsel's objection to the last comment as nonresponsive and the prosecutor moved to a different subject.

On cross-examination, Aranas agreed that children do not all act the same after being sexually assaulted, some children have no noticeable behavioral changes, some children who act out have not been molested, and a change in behavior does not necessarily indicate an assault has occurred.

### 3. No CSAAS Evidence Presented

We agree with the People that Aranas's testimony did not constitute CSAAS evidence. Aranas's expertise was limited to his experience and training as a sexual assault detective, and he was neither an expert on CSAAS nor did he purport to be one. Critically, Arana's testimony, which was limited in nature, did not implicate CSAAS.

As previously discussed, "CSAAS testimony has been held admissible for the limited purpose of disabusing a jury of misconceptions it might hold about how a child reacts to a molestation." (*People v. Patino* (1994) 26 Cal.App.4th 1737, 1744, citing *People v. McAlpin* (1991) 53 Cal.3d 1289, 1300–1301 & *Bowker, supra*, 203 Cal.App.3d at p. 391; accord, *People v. Ramirez* (2023) 98 Cal.App.5th 175, 219; *Sedano, supra*, 88 Cal.App.5th at p. 479; *People v. Munch* (2020) 52 Cal.App.5th 464, 468; *People v. Gonzales* (2017) 16 Cal.App.5th 494, 503.) The evidence is relevant "if the victim's credibility is placed in issue due to the paradoxical behavior" (*Patino, supra*, at pp. 1744–1745), such as a significant delay in reporting or recanting the allegations of abuse in whole or in part (*Bowker, supra*, at p. 394). (Accord, *People v. Flores* (2024) 101 Cal.App.5th 438, 456.) "Identifying a 'myth' or 'misconception' has not been interpreted as requiring the prosecution to expressly state on the record the evidence which is

16.

inconsistent with the finding of molestation" (*Patino, supra*, at p. 1744), but "at a minimum the evidence must be targeted to a specific 'myth' or 'misconception' suggested by the evidence" (*Bowker, supra*, at pp. 393–394). "Where there is no danger of jury confusion, there is simply no need for the expert testimony." (*Id.* at p. 394.)

This was not a complex case. It involved two crimes committed against a young victim and, as reflected in the forensic interview and trial testimony, B. was easily distracted and did not have an easy time recalling all the details, but the case did not involve any significant delay in reporting, recantation, or other paradoxical behavior by B. Notably, the crimes, the change in behavior noted by L., B.'s initial disclosure, and her interview at the hospital all occurred in January 2023. The testimony highlighted by defendant on appeal related to statements B. made during her forensic interview and touched on behavioral changes, but we disagree that under the circumstances in this case, the testimony constituted CSAAS evidence. Aranas did not offer any testimony directed at clarifying any myth or misconception based on paradoxical behavior by B. Therefore, defense counsel's failure to request an instruction under CALCRIM No. 1193 may be readily explained by the fact that there was no expert testimony on CSAAS. Alternatively, counsel may have reasonably concluded that even if the testimony touched slightly on areas suggestive of CSAAS, a limiting instruction was unnecessary under the circumstances.

Moreover, defendant cannot show prejudice because there is no reasonable probability of a more favorable outcome had it not been for the omission of a limiting instruction on CSAAS, which forecloses defendant's claim. (*Woodruff, supra*, 5 Cal.5th at p. 739; see *Harrington v. Richter* (2011) 562 U.S. 86, 112 ["The likelihood of a different result must be substantial, not just conceivable."].)

## II. Claim of Sentencing Error

Next, the trial court imposed the upper term of 10 years on count 2 based on its finding that B. "was particularly vulnerable." (Rule 4.421(a)(3).) Defendant claims the

court erred in relying on B.'s age to find her particularly vulnerable (rule 4.420(h)), and, as a result, its finding is not supported by substantial evidence. Defendant further claims that the court erred when it considered B.'s age on a spectrum that included minors up to the age 18 years old and given the court's stated struggle over which term to impose, this error was prejudicial.

We conclude that the trial court found B. particularly vulnerable based on more than just her age and, therefore, the court's finding on this factor is supported by substantial evidence. Further, to the extent the trial court's comment about minors up to the age of 18 years old was made in the context of section 288 specifically, we find any error harmless. The record reflects the court struggled over which term to impose, but it ultimately selected the upper term due to B.'s particular vulnerability. Given that B. was only five years old, we do not agree there is a reasonable probability of a result more favorable to defendant had the court considered her age on a spectrum that only included children up to the age of 14 years rather than up to the age of 18 years. (*People v. Avalos* (1984) 37 Cal.3d 216, 233.)

### A.    Section 1170

As amended by Senate Bill No. 567 (2021–2022 Reg. Sess.), effective January 1, 2022, section 1170, subdivision (b), provides:

"(b)  [¶]  (1)  When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).

"(2)    The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation of the crime that justify the imposition of a term of imprisonment exceeding the middle term and the facts underlying those circumstances have been stipulated to by the defendant or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial. Except where evidence supporting an aggravating circumstance is admissible to prove or defend against the

18.

charged offense or enhancement at trial, or it is otherwise authorized by law, upon request of a defendant, trial on the circumstances in aggravation alleged in the indictment or information shall be bifurcated from the trial of charges and enhancements. The jury shall not be informed of the bifurcated allegations until there has been a conviction of a felony offense.

"(3) Notwithstanding paragraphs (1) and (2), the court may consider the defendant's prior convictions in determining sentencing based on a certified record of conviction without submitting the prior convictions to a jury. This paragraph does not apply to enhancements imposed on prior convictions.

"(4) At least four days prior to the time set for imposition of judgment, either party or the victim, or the family of the victim if the victim is deceased, may submit a statement in aggravation or mitigation to dispute facts in the record or the probation officer's report or to present additional facts. The court may consider the record in the case, the probation officer's report, other reports, including reports received pursuant to Section 1203.03, and statements in aggravation or mitigation submitted by the prosecution, the defendant, or the victim, or the family of the victim if the victim is deceased, and any further evidence introduced at the sentencing hearing.

"(5) The court shall set forth on the record the facts and reasons for choosing the sentence imposed. The court may not impose an upper term by using the fact of any enhancement upon which sentence is imposed under any provision of law. A term of imprisonment shall not be specified if imposition of sentence is suspended.

"(6) Notwithstanding paragraph (1), and unless the court finds that the aggravating circumstances outweigh the mitigating circumstances that imposition of the lower term would be contrary to the interests of justice, the court shall order imposition of the lower term if any of the following was a contributing factor in the commission of the offense:

19.

"(A)   The person has experienced psychological, physical, or childhood trauma, including, but not limited to, abuse, neglect, exploitation, or sexual violence.

"(B)   The person is a youth or was a youth as defined under subdivision (b) of Section 1016.7 at the time of the commission of the offense.

"(C)   Prior to the instant offense, or at the time of the commission of the offense, the person is or was a victim of intimate partner violence or human trafficking.

"(7)   Paragraph (6) does not preclude the court from imposing the lower term even if there is no evidence of those circumstances listed in paragraph (6) present."

With respect to enhancements, section 1170.1, as amended by Senate Bill No. 567 (2021–2022 Reg. Sess.), provides in relevant part:

"(d)  [¶]  (1)  When the court imposes a sentence for a felony pursuant to Section 1170 or subdivision (b) of Section 1168, the court shall also impose, in addition and consecutive to the offense of which the person has been convicted, the additional terms provided for any applicable enhancements.  If an enhancement is punishable by one of three terms, the court shall, in its sound discretion, order imposition of a sentence not to exceed the middle term, except as otherwise provided in paragraph (2).

"(2)   The court may impose a sentence exceeding the middle term only when there are circumstances in aggravation that justify the imposition of a term of imprisonment exceeding the middle term, and the facts underlying those circumstances have been stipulated to by the defendant, or have been found true beyond a reasonable doubt at trial by the jury or by the judge in a court trial."

**B.      Imposition of Upper Term Based on Victim's Vulnerability**

Imposition of an upper term may be based on a single, properly proven aggravating factor.  (*People v. Lynch* (2024) 16 Cal.5th 730, 764, 768.)  In this case, based on B.'s particular vulnerability (rule 4.421(a)(3)), the court imposed the upper term

of 10 years on count 2, committing a lewd or lascivious act on a child under the age of 14 years by force, violence, duress, menace, or fear (§ 288, subd. (b)(1)). However, "[a] fact that is an element of the crime on which punishment is being imposed may not be used to impose a particular term" (rule 4.420(h)), and where the victim's age is an element of the offense, as under section 288, age alone is insufficient to support a finding that the victim is particularly vulnerable.

As the Court of Appeal explained in *Flores*, in the context of former section 288a, "The Legislature has determined that persons under the age of 18 years may not lawfully consent to participating in an act of oral copulation. (Pen. Code, [former] § 288a, subd. (b)(1).) In fact, for persons over the age of 21 years who participate in such an act with someone under 16 years of age, their offense can only be punishable as a felony. (Pen. Code, [former] § 288a, subd. (b)(2).) Furthermore, when the minor is under the age of 14 years the penalties are increased to 3, 6 and 8 years. (Pen. Code, [former] § 288a, subd. (c).) In sum, it seems clear that the Legislature already has determined that all persons of specified ages are 'particularly vulnerable' by reason of their age alone and, consequently has provided increased punishment for offenses committed against them." (*People v. Flores* (1981) 115 Cal.App.3d 924, 927.) Nevertheless, the court recognized "there undoubtedly may be situations in which a minor between the ages of 14 and 16 years could appropriately be determined 'particularly vulnerable,' such as when he or she is mentally deficient, physically handicapped, rendered intoxicated, etc. ...." (*Ibid.*, fn. omitted.)

Subsequently, the Court of Appeal in *Ginese* elaborated, "We might add to the listed potential factors making a victim of an 'age range offense' particularly vulnerable circumstances such as supervision or control a defendant has over the victim, including perhaps consideration of the time or location of the offense giving rise to a vulnerability through isolation, temporary dependency or fear of factors other than the defendant himself. Extreme youth within the given age range might also be viewed as making a

victim 'particularly vulnerable' in relation to others within the age range, but in those instances dependency or fear is invariably also involved and should be stated as the basis for the vulnerability." (*People v. Ginese* (1981) 121 Cal.App.3d 468, 477.)

## C. Analysis

In arguing the trial court relied in error on B.'s age to find her particularly vulnerable, defendant focuses on the sentencing hearing, where the court discussed her age in the context of selecting the upper term. However, the court made the finding that B. was, beyond a reasonable doubt, particularly vulnerable at a prior proceeding and, in doing so, the court expressly acknowledged its finding could not be based on her age alone. The court explained, "[T]he age I know is something that you look at but *can't be the only reason*. I think the analysis to me is that I do find it true, the aggravating factor, is the preparation and planning, waiting for mom to take off, and the force that is inherent within it, but it's the planning that's involved, the timing of the acts thereafter after meeting the child—being around the child for only a couple weeks." (Italics added.)

"[F]or purposes of finding the aggravating factor of particular vulnerability, "'[p]articularly … means in a special or unusual degree, to an extent greater than in other cases. Vulnerability means defenseless, unguarded, unprotected, accessible, assailable, one who is susceptible to the defendant's criminal act." [Citation.]' [Citation.] Thus, a crime victim can be deemed particularly vulnerable as an aggravating factor 'for reasons not based solely on age, including the victim's relationship with the defendant and his abuse of a position of trust.'" (*People v. DeHoyos* (2013) 57 Cal.4th 79, 154 (*DeHoyos*).) L. testified that she was a single mother, and defendant was the first man to be around her children. She had known him since childhood, but they did not have any contact for seven years before reconnecting in August 2022 and moving in together. Due to her own history of being sexually abused, she was "very overprotective of [her] children" and she was reluctant to leave them alone the day she went to the bakery with her sister. After defendant persuaded L. it would be okay to leave, he proceeded to isolate B. in the

22.

bathroom and molest her. Subsequently, he entered B.'s bedroom where she was sleeping so he could molest her while L. was in the shower.

Thus, there is evidence to support the trial court's finding that defendant prepared for and planned the assaults, that the assaults occurred when L. was unable to protect her daughter because she was gone (bakery) or indisposed (shower), and that defendant committed the assaults after living with B. only a short time. While age alone cannot support a finding of particular vulnerability because it is an element of the offense, B.'s young age coupled with the facts that defendant targeted her for victimization soon after moving in with the family and he took immediate advantage of L.'s absence to do so is sufficient to support the court's finding. (E.g., *DeHoyos, supra*, 57 Cal.4th at pp. 154–155 [victim's relationship with a defendant and his abuse of position of trust will support finding of particular vulnerability]; *People v. Garcia* (1985) 166 Cal.App.3d 1056, 1069–1070 [extreme youth coupled with close relationship to the defendant]; *People v. Hetherington* (1984) 154 Cal.App.3d 1132, 1141–1142 [supervision and control over victim at day care center]; *People v. Garcia* (1983) 147 Cal.App.3d 1103, 1105 [parental relationship to victim]; see *People v. Quintanilla* (2009) 170 Cal.App.4th 406, 413 [exploitation of relationship as victim's neighbor and father of victim's friend sufficient to justify consecutive sentence].)

Accordingly, we reject defendant's claim that the trial court relied solely on B.'s age to find her particularly vulnerable. The trial court acted within its discretion in finding B. was particularly vulnerable based on a combination of factors that are supported by evidence in the record. Although the court later discussed B.'s age during the sentencing hearing, this does not undermine its earlier finding, which was expressly based on a combination of factors that were also argued at the sentencing hearing.

Finally, defendant characterizes the trial court's statement during sentencing as misstating a fact because section 288 proscribes committing a lewd or lascivious act on a child under the age of 14 years and the court discussed B.'s age in the context of a crime

23.

that could be committed against a minor up to the age of 18 years. The court stated it struggled with the middle term versus the aggravated term, but then "looked at it from the standpoint of the age of the child because there's a—there's a zero to whatever age of a child that could be up to 18, and this is a five year old; right? And with the facts that are mentioned by [the prosecutor] and that came out in the trial, the Court was looking at the spectrum of the age, the event, how it happened, how vulnerable the child is. [¶] Yes, the child could be more vulnerable at five than at 17, or 15, 10 than a child who's one or two would be more vulnerable than a five year old, so I was looking at it from that spectrum."

It is not clear whether the court was merely discussing B.'s age in the context of minority in general from the age of zero to 18 years or was instead discussing age in the context of section 288 specifically and compared B.'s age in error to a child up to the age of 18 years rather than up to the age of 14 years. As a general matter, "[a]bsent evidence to the contrary, we presume that the trial court knew the law and followed it" (*People v. Ramirez* (2021) 10 Cal.5th 983, 1042), but assuming the court was discussing B.'s age within the context of section 288 rather than in the context of minority in general and erred in viewing it on a spectrum up to the age of 18 years, the error was harmless (*People v. Avalos, supra*, 37 Cal.3d at p. 233 [sentencing error harmless where not reasonably probable a more favorable sentence would have been imposed in absence of error]; accord, *DeHoyos, supra*, 57 Cal.4th at p. 155; *People v. Sperling* (2017) 12 Cal.App.5th 1094, 1104). There is no reasonable probability of a result more favorable to defendant had the court viewed B.'s age on a spectrum that included children up to 14 years old rather than 18 years old. The court had already found B. particularly vulnerable and whether compared to a 13 year old or a 17 year old, a five year old child is significantly younger.

For these reasons, we find no prejudicial sentencing error.

**DISPOSITION**

The judgment is affirmed, but the trial court shall correct its minute order from July 5, 2023, to reflect that only the aggravating circumstances alleged as factor 1 (prior convictions numerous or increasing in seriousness) and factor 2 (victim particularly vulnerable) were found true beyond a reasonable doubt.

MEEHAN, J.

WE CONCUR:

LEVY, Acting P. J.

DeSANTOS, J.